NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
LINDA A. KUBIN,                             :
                                            :
       Plaintiff,                 :    Civ. No. 06-1299 (AET)
                                            :
    v.                                    :
                                            :    MEMORANDUM OPINION
JO ANNE B. BARNHART, as                     :
COMMISSIONER OF SOCIAL                      :
SECURITY ADMINISTRATION,                    :
                                            :
       Defendant.                 :
_____:

THOMPSON, U.S.D.J.

I.    Introduction

    This matter is before the Court on Plaintiff Linda A. Kubin's appeal of a final administrative decision by Defendant Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's claim for Social Security disability insurance ("SSDI") benefits.  The Court has jurisdiction to decide this matter pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).  For the reasons set forth below, this matter will be remanded for further consideration consistent with this opinion.

II.    Background

    A.    Plaintiff's Medical and Work History

    Plaintiff is fifty-three years old and has a college education.  She previously worked as a freelance commercial artist, a bartender, and a chiropractor.  (R. at 40-42.)  During February

1993, Plaintiff worked as chiropractor and maintained a "normal full-time practice." (R. at 43.) On February 7, 1993, Plaintiff complained of becoming acutely ill, and ceased any work until the end of September of that year. After, Plaintiff worked part time, between ten and twenty-five hours per week, taking "bad days" off when she felt too ill to go to work. (R. at 52.) By July 1, 1994, Plaintiff ceased any substantial gainful employment activity. (R. at 45.)

Prior to her cessation of work and thereafter, Plaintiff complained and sought treatment for a number of maladies including pain in her neck, right arm, wrist and thumb, arrhythmia of her heart, and hypothyroidism. All medical records contained in the administrative record were reviewed and the following is a recitation of the most relevant reports drafted by various treating and examining physicians.

    1.    <u>Neck and Right Arm Pain</u>

On October 29, 1992, Dr. Joseph P. Leddy began seeing Plaintiff, noting that she had pain in her neck and shoulder radiating into her right arm, numbness in the fingers of her right arm, muscle spasms, and other associated ailments. He concluded that the ailments were caused by two auto accidents, the most recent of which occurred in July of 1992. (R. at 249.) Dr. Leddy noted Plaintiff had "reasonably good range of motion in her cervical spine . . . . [was] extremely tender over the brachioplexus and supraclavicular fossa . . . . [and had] weakness [exhibited by] testing of her rotator cuff musculature on the right . . . ." (<u>Id.</u>) Further, Dr. Leddy noted Plaintiff had "early carpal tunnel syndrome" and recommended she wear a wrist splint at night. (R. at 249-50.)

On May 20, 1993, Dr. Leddy again saw Plaintiff, noting that she suffered from "recurrent syncopal episodes" with continued musculoskeletal problems resulting in "discomfort in her right

hand and wrist." (R. at 247.) Dr. Leddy stated "[s]he has a good range of motion of her cervical spine," and that "she has good strength." (Id.) Dr. Leddy's recommendation was that "she should continue to try to resume her normal activities from a physical standpoint . . . ." (Id.)

On June 12, 1993, Dr. Kim Wayne Oman of the Chiropractic Clinic wrote a letter to Plaintiff's attorney detailing Plaintiff's inability to perform professional and household duties due to injuries suffered to her neck, shoulder, arm, and headaches caused from her prior car accidents. During Plaintiff's consultation with Dr. Oman, Plaintiff complained of "frequent right arm pain with right hand parathesia; low back and left leg pain, characterized as a varying sharp to dull ache with an occasional parathesia; headaches frequent and severe." (R. at 416.) Dr. Oman examined Plaintiff and found marked decrease in hand grip strength of the right compared with the left. Dr. Oman observed significant tenderness in the neck, back, shoulders and arms of Plaintiff and found that she suffered from numerous injuries and that her spinal column and contiguous areas would experience premature aging. Dr. Oman, also, noted that Plaintiff's MRI taken in September of 1992 was normal, and that x-rays of the back found no recent fractures, though "[t]here was suspected degenerative disc disease" among several vertebrae. (R. at 418.)

On October 22, 1993, Dr. Ronald M. Selby conducted an examination of Plaintiff and wrote a report on December 10, 1993, discussing her condition. There, Dr. Selby stated that Plaintiff had "a near full range of motion of the right wrist with slight discomfort noted in the radial aspect of the carpus." Plaintiff received a bone scan on November 11, 1993, revealing "increased activity involving the right hand and wrist compared to the left." Dr. Selby recommended "a modification of activities particularly in light of her occupation as a chiropractor . . . ." (R. at 376.) Dr. Selby placed Plaintiff in a thumb cast, which was removed

approximately one month later and effected "[s]ome improvement" in Plaintiff's condition.  (Id.)

On March 6, 1997, Dr. Brian C. Halpern of Sports Medicine New Jersey prepared an "independent evaluation" of the Plaintiff.  In that report, Dr. Halpern noted Plaintiff "still has discomfort in the neck intermittently with driving and sitting for a long time, as well as, inability to do twisting activities with the right thumb or open objects [as this] causes it to swell and become painful."  (R. at 334.)  Beyond that, Dr. Halpern stated she has "no other symptomatology [and] her low back doesn't bother her at all."  (Id.)  Dr. Halpern's physical examination revealed "a well developed, well nourished female in no apparent distress." (R. at 335.)  Dr. Halpern did note that testing of the thumb indicated that reconstruction of the ulnar collateral ligament may be necessary if it continued to cause Plaintiff pain, and decreased usage, but he stated "[n]o further treatment needs to be performed for the neck."  (Id.)

2.    Arrythmia

On March 30, 1993, Plaintiff attended Johns Hopkins Medical Institutions ("Johns Hopkins") for a series of tests after being referred by two of her treating physicians.[1]  Dr. Calkins, a Johns Hopkins doctor, found Plaintiff had a twenty year history of recurrent syncope, with episodes typical for "vasodepressor syncope."  Dr. Calkins stated that monitoring showed

---

[1]Dr. Richard Snepar, a referring doctor, stated in a June 1993 letter that Plaintiff was "totally disabled since February 6, 1993, though no diagnosis is listed, nor any suspected cause, other than a conclusion that Plaintiff has a "chronic medical condition."  (R. at 379.)  On August of 1993, Dr. Snepar stated that Plaintiff "continues to be ill with a complex medical condition," which is related to her "recurrent premature ventricular contractions" though the causes of this condition are "unknown." (R. at 380.)   There is no record of what, if any tests were conducted, or what examination Dr. Snepar performed.  In another letter dated June 10, 1993, Counseling Psychologist Albert L. Record, Ed. D., stated that Plaintiff was being treated for "post traumatic stress disorder [("PTSD")] with a delayed onset. One of the symptoms of this disorder is a diminished interest in significant activities resulting in a decreased ability to carry out or fulfill ones [sic] obligations." (R. at 593.)  No further mention of PTSD was found in the record.

that Plaintiff had arrhythmia, as well as ventricular tachycardia, and left bundle morphlogy.  Dr. Calkins recommended several treatments which Plaintiff rejected.  (R. at 385.)   Dr. Calkins found Plaintiff's denial of treatment was reasonable as her condition was not "life threatening," however, he stated should her symptoms become worse, "it would be reasonable to consider" other forms of therapy.  (Id.)  Plaintiff testified at the administrative hearing that her arrhythmia was caused by "any kind of exertion" and that it resulted in fatigue, which deprived her of energy to do normal household activities, and placed her in a "mental fog."  (R. at 53.)

    3.    Hypothyroidism

Plaintiff also underwent hormonal testing at Johns Hopkins.  On April 7, 1993, Dr. Waltman found that Plaintiff's "thyroid hormone levels as well as the thyroid-stimulating hormone level were normal."  (R. at 431.)  The report indicated that she had prior elevation of TSH, which "may have occurred during a recovery period from an acute illness" and that there was no indication of thyroid disease. (Id.)  The report also concluded that "[i]t is most likely. . . that [Plaintiff] has hypothyroidism secondary to Hashimoto's thyroiditis" and that "patient's history of fatigue, abdominal pain, and previous laboratory values . . . does suggest this diagnosis."  (Id.)

    B.    Procedural History

Plaintiff filed an application for SSDI benefits on August 17, 2000.  She alleged that she became disabled and was unable to continue working as of July 1, 1994.  Plaintiff's application was denied initially and again upon reconsideration.  Plaintiff requested a hearing, which was held on September 21, 2002, before Administration Law Judge Gerald R. Cole who later issued an opinion denying her claim.  Plaintiff timely requested a review of Judge Cole's decision and

the Appeals Council of the Social Security Administration ("Appeals Council") remanded the matter for a new hearing.  Administrative Law Judge Jon L. Lawritson, ("the ALJ") presided over the second hearing, and issued an opinion denying Plaintiff's claim on July 6, 2004.  A second request for review was timely filed with the Appeals Council and was denied.  As a result, the ALJ's decision became the Commissioner's final decision.  Having exhausted her administrative remedies, Plaintiff timely filed an appeal before this Court on March 15, 2006.

III.     Applicable Law

    A.     Standard of Review

A district court has plenary review of the Commissioner's application of the law, and reviews the Commissioner's findings of fact to determine whether they are supported by substantial evidence.  42 U.S.C. § 405(g); Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).  A court is required to review the entire record when making those determinations.  5 U.S.C. § 706; Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003).

A court must affirm the Commissioner's decision if there is substantial evidence supporting it.  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The Commissioner's decision is afforded a great amount of deference; a court should not "set the . . . decision aside if it is supported by substantial evidence, even if [it] would have decided the factual inquiry differently."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

    B.     The Commissioner's Analysis for an Award of Disability Benefits

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is not under a disability unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id.; § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step evaluation to determine whether an individual is disabled. See 20 C.F.R. § 404.1520; see generally Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). In step one, the Commissioner decides whether the claimant is currently engaging in substantial gainful activity. If so, the claimant is not eligible for disability benefits. 20 C.F.R. § 404.1520(a)(4). In step two, the Commissioner determines whether the claimant is suffering from a severe impairment. The definition of severe, under the regulations, is a "de minimis" standard, requiring a showing beyond "slight abnormalities" that do not impact one's ability to perform basic work functions. See, e.g., Newell v. Commissioner of Social Security, 347 F.3d 541, 546 (3d Cir. 2003) (stating "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities" and that the issue of severity is "a de minimis screening device to dispose of groundless claims") (citations omitted). If the impairment is not "severe," the claimant is not eligible for disability benefits. Id.; 20 C.F.R. § 404.1520(c). If the Commissioner finds that the claimant has a "severe" impairment, then the analysis continues to step three where the Commissioner examines if the medical evidence indicates that the impairment is equivalent to one listed in 20 C.F.R. Part 404,

Subpt. P, App. 1.  If so, the claimant is automatically eligible for benefits.

If the Commissioner finds that the impairment does not match one of the listed impairments, then the analysis continues under step four.  In step four, the Commissioner reviews whether the claimant retains the "residual functional capacity" to perform her past relevant work.  "'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by [her] impairment(s)."  Hartranft, 181 F.3d at 359 n.1 (citing 20 C.F.R. § 404.1545(a)).  If a claimant can perform her past relevant work, she is not eligible for disability benefits.  20 C.F.R. § 404.1520(f).  Finally, in step five, the Commissioner considers whether other work "exist[s] in significant numbers in the national economy that the claimant can perform given [her] age, education, past work experience, and residual functional capacity."  Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002) (citing Plummer, 186 F.3d at 428).  If there is such work, the claimant is not eligible for benefits.  20 C.F.R. § 404.1520(g).  In this final step, "the burden of production shifts to the Commissioner, who must demonstrate that the claimant is capable of performing other available work in order to deny a claim of disability."  Plummer, 186 F.3d at 428.

IV.    Discussion

Under steps one and two of the evaluation, the ALJ found that Plaintiff had not been engaged in substantial gainful activity since her alleged disability began and found that Plaintiff's neck, right hand, hypothyroidism, and arrhythmia impairments qualified as severe.  The ALJ stated "the evidence supports a finding that . . . the claimant had cervical strain, ulnar collateral ligament injury to the right thumb, hypothyroidism and arrhythmia, impairments which caused more than a minimal effect on the claimant's physical or mental ability to perform basic work-

related functions." (R. at 21.) Because Plaintiff's extensive medical records touch upon a variety of ailments at differing points throughout her medical history, the ALJ then screened out several maladies he considered were insufficiently severe or insufficiently documented to find Plaintiff disabled. Next, the ALJ concluded that Plaintiff's impairment did not meet those listed under 20 C.F.R. Part 404, Subpt. P, App. 1. The ALJ explained that the musculoskeletal problems asserted by Plaintiff failed to cause an "extreme limitation in the ability to ambulate or . . . perform fine or gross movements with the upper extremities" required in the medical listings in 1.00(H)(4) and 404.1526. (R. at 22.) Further, the ALJ found that neither Plaintiff's arrhythmia nor Plaintiff's hypothyroidism met criteria within the medical listings. (Id.)

The ALJ then moved on to the step four analysis, and considered whether Plaintiff's impairment prevented her from doing her past relevant work. The ALJ evaluated Plaintiff's residual functional capacity ("RFC"), reviewing the objective evidence as well as Plaintiff's subjective complaints of pain. (R. at 23-24.) Based on his review, the ALJ concluded Plaintiff could not resume her past relevant work, due to limited mobility in her upper right extremity.

At the step-five inquiry, the ALJ relied on testimony given by the Commissioner's vocational expert who testified that Plaintiff could perform other work in the national economy. The vocational expert stated Plaintiff could perform jobs such as a school bus monitor, surveillance system monitor, and usher, all of which were available in significant numbers in the national economy. The ALJ agreed with this analysis and determined Plaintiff was "not disabled within the meaning of the Social Security Act" and "not entitled to receive Disability Insurance Benefits." (R. at 30.)

Plaintiff argues that (1) the ALJ failed to properly assess her RFC; and (2) the vocational

expert's opinion should be rejected because the ALJ failed to accurately portray Plaintiff's impairments when asking the vocational expert hypothetical questions.  As the Commissioner has adopted the ALJ's decision as her final determination, the Court will review that decision.  The ALJ's determinations at steps four and five are at issue in this case.

    A.    <u>Step Four: Residual Functional Capacity</u>

Plaintiff contends that the ALJ erred in his determination of Plaintiff's residual functional capacity because the ALJ "refuse[d] to translate [any of Plaintiff's] severe impairments into any work related restrictions."  Plaintiff argues the ALJ incorrectly ruled Plaintiff retained "the residual functional capacity to perform all work activity."  (R. at 30.)

The ALJ must "consider <u>all</u> the relevant evidence when determining an individual's [RFC] in step four."  <u>Fargnoli</u>, 247 F.3d at 41 (emphasis added).  This includes "descriptions of limitations by the claimant and others."  <u>Id.</u>  The Social Security Administration divides the assessment of RFC into exertional categories, as well as non-exertional categories.  Exertional categories describe limitations in functioning which "affect your ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569(a).  This category is divided into four groups: sedentary, light, medium, and heavy work.  20 C.F.R. § 404.1567.  Non-exertional impairments are limitations which "affect only your ability to meet the demands of jobs other than the strength demands."  20 C.F.R. § 404.1569(c)(1).  These impairments "remain constant at all levels of exertion."  <u>Id.</u>

The ALJ ruled Plaintiff "retained the residual functional capacity to perform all work activities, except that she was not able to handle with her right upper extremity." (R. at 27, 30.) He also stated that Plaintiff "was unable to perform the full range of work at any exertion level,

[but] was capable of making an adjustment to work which existed in significant numbers in the national economy." (R. at 30.) It appears, though the record does not state this expressly, that the ALJ found that Plaintiff's impairments relating to her ability to grip, and use her right arm constituted a non-exertional impairment. Under the statutory framework, and case law, such a limitation may constitute a non-exertional impairment and therefore the ALJ's decision in that regard, though not entirely clear, could be supported by substantial evidence. Hurt v. Secr'y of Health & Human Servs., 816 F.2d 1141, 1143 (6th Cir. 1987); 20 C.F.R. § 404.1569(c)(1)(vi) (stating non-exertional impairments may include "difficulty performing the manipulative or postural functions of some work such as reaching, handling"). However, as Plaintiff's brief points out, the ALJ never evaluated what, if any, impact Plaintiff's cervical strain, arrhythmia and hypothyroidism played on her RFC. The ALJ found that Plaintiff's cervical strain, arrhythmia and hypothyroidism were "severe" impairments, and discussed the medical record of those impairments, (R. at 24-25), yet the ALJ's decision completely lacks any discussion of how those impairments affected Plaintiff's RFC. Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir.2001) (stating the ALJ's residual functional capacity assessment must "be accompanied by a clear and satisfactory explanation of the basis on which it rests"). Social Security Ruling 96-8p provides guidance on the specifics of what the RFC analysis should include:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also

> explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.  A failure to first make a function-by-function assessment of the claimant's limitations or restrictions could result in the adjudicator overlooking some of the claimant's limitations or restrictions.

Soc. Sec. Rul. 96-8p.  It appears that the ALJ overlooked Plaintiff's restrictions, never making a determination of Plaintiff's RFC or exertional level.  Defendant argues that the ALJ made a finding "that plaintiff did not did not [sic] have exertional limitations due to [her severe impairments]." (Def.'s Br. at 13.)  However, upon review, it is clear that the ALJ's decision is devoid of any discussion of Plaintiff's RFC, and potential exertional limitations.  Therefore, on remand, the ALJ must address Plaintiff's RFC, articulating which medical evidence he adopts, which he rejects, with a thorough explanation of his reasoning.  See, e.g., Santiago-Rivera v. Barnhart, No. 05-5698, 2006 WL 2794189, at *13 (E.D. Pa., Sep. 26, 2006) (remanding because "the ALJ simply failed to properly address the assessment and impact of [Plaintiff's] "severe" headaches upon [Plaintiff's] RFC").

      B.      Step 5: Questioning the Vocational Expert

The ALJ asked several hypothetical questions of the vocational expert regarding what jobs Plaintiff could perform.  Where, as here, the record supports some limitation on particular functions, the ALJ must include such limitations in his hypothetical questioning.  See, e.g., Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995) (stating "the ALJ's failure to include in his hypothetical inquiry to the vocational expert any limitation in this regard violated the established rule that such inquiries must include all (and only) those impairments borne out by the evidentiary record").  Here, the ALJ failed to do this, stating his hypothetical as "I'd like you to assume there's an individual who . . . . can do no handling with the dominant right upper

extremity." He then asked the vocational expert what jobs would be available to a person "at the sedentary exertional level." When the ALJ was dissatisfied with the vocational expert's reply he asked the expert to take away the sedentary level restriction and "just make it the light, the medium or any other level." (R. at 73.) These questions failed, to include a specific recitation of the impairments borne out by the evidentiary record and cannot, therefore, constitute substantial evidence on which the ALJ may rely. Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (stating a "hypothetical question posed to a vocational expert must reflect all of a claimant's impairments" supported by the record) (internal quotations omitted); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The case must be remanded so that the hypothetical questions asked of the expert can include Plaintiff's RFC level and each impairment established within the record.

V.     Conclusion

This matter will be remanded for further findings and proceedings consistent with this Memorandum Opinion. An appropriate order is filed herewith.


                                                    s/Anne E. Thompson
                                              ANNE E. THOMPSON, U.S.D.J.


Dated: February 8, 2007